and Ms. Starr, we'll hear from you. May it please the Court, my name is Susan Starr and I represent the Equal Employment Opportunity Commission as appellant. The charging party in this case, Ms. Jennings, worked for the defendant law firm Womble Carlyle for about 11 years as a support person, or known in the lexicon of this case as an SSA. Her primary job duties were scanning, copying, and printing. In 2008, as a result of complications from breast cancer surgery, Jennings' lifting, her lifting became impaired. Between 2008 and 2011, two doctors at separate times put her on lifting restrictions, 10 pounds and then 20 pounds. In 2011, the 20-pound lifting restriction was permanent. Soon thereafter, Womble Carlyle told her she could not return to work without demonstrating she could lift up to 75 pounds. The district court erred when it held that lifting more than 20 pounds was an essential job function. The reason they gave her at the time, when they told her she could not return to work, was that she could not lift up to 75 pounds. 20 pounds was never mentioned. Moreover, lifting in this job is not an essential job function. The essential job functions were scanning, copying, and printing. There was a requirement. Doesn't that include lifting? It includes. As a matter of fact, several of the incidents involved, well, paper in cart boxes. When you print, you have to get paper and restore the machine. And if nobody's there to help you, you've got a problem. And scanning documents were in the box. They said 30-pound boxes of documents were being scanned and had to be lifted. So it doesn't advance the ball too much to say all she was doing is picking the paper and putting it on the glass or stacking it in. I mean, scanning and copying is a bigger function. You probably have to take it back to where it came from. If you've litigated, and I'm sure you have because you're here, but you have the war rooms where you have the boxes of documents. And they take them to the scanning machine. And then you take them back and give them to the attorneys. So inherently, there is some lifting, probably not 75 pounds. I think the evidence in this case really was somewhere in the range up to 50 pounds. But I just didn't want us to get a handle on scanning, copying, and printing and saying that that was totally benign to any lifting requirements. Your Honor, I think you make a good point. But it's not about lifting. It's about moving. It's about moving the documents from point A to point B. Whether you're moving or lifting or whatever you're doing, it seems to me if you're carrying out the function, I mean, for instance, they couldn't have her at the two buildings where she would be the only person being a support person because there'd be no one to help her in case she needed new paper, had apparently, they said if you had a mail pickup, the full pack of mails would present a problem or delivering packages. This is one of those cases where it's really you have to admire this woman as she goes through and tries to make it work. She breaks down the boxes. And she does it. And her attitude's good. And she works hard. And I hope there's some way she can be working. So there's no blame here. And likewise, it looks like the law firm was trying to work with her. But when they found it's permanent, they found it didn't fit the job. And so the real question is, I guess the ultimate question is legally whether she was qualified for the job. And your argument is, I gather, that this weight requirement in lifting things wasn't of such a large proportion or necessity for the job as to be a qualification. I gather that's your point. The point is, yes. And if you look at the record in this case, she worked at this job for 11 years. From 2008 to 2011, she had lifting restrictions. According to Wamble Carlyle, she successfully performed her job consistently throughout that period of time with the lifting restrictions. She testified at length as to precisely how she accomplished her tasks. Like you mentioned, Your Honor, about kind of breaking up and being very creative and figuring out ways to accomplish her task with lifting restrictions. The record also reflects that she was idle for large portions of the workday after the restriction, I think it's J8507. But my point, let me go to my point. The district court found, and I don't understand you to dispute it, that Jennings was unable to perform the essential functions of her job even with reasonable accommodations because she would be unable to work at Liberty Plaza or Winston Tower or work the Saturday shift where she would be alone. She would be unable to deliver mail to the floors, deliver boxes of copy paper, pick up or deliver copy jobs weighing more than 20 pounds, lift or carry packages weighing over 20 pounds that need to be shipped or mailed, move heavy furniture, complete other tasks that involved or could involve lifting more than 20 pounds. And that the ADA does not require employers to assign an employee to permanent light duty or reallocate job duties in order to change the essential functions of the job. That's a fairly exhaustive list of things that she would not be able to do on her own. I'd like to point the court to page 33 in Womble Carlyle's brief in which it specifically . . . And that would be great if you could . . . This exactly goes to this point in which they actually concede that with her 20-pound lifting restriction, she could do everything that you just mentioned, Your Honor. She could work alone at Liberty Plaza? She could work alone where the need to move something over 20 pounds might arise? Yes. Before she injured her shoulder in June 2010, Jennings performed numerous SSA functions that required lifting more than 20 pounds such as making mail runs to her assigned floors at 1 West 4th, processing heavier FedEx packages, moving paper boxes from one location to the other, working alone at Liberty Plaza in Winston Tower, and covering all operational needs including post office runs while working by herself on Saturday rotations. That . . . They said before she was injured in June 2010. Her lifting restriction began in 2008. She did . . . She testified, and it's undisputed, that she completely and successfully performed . . . Well, under their assessment, successfully performed her job between 2008 and 2010 without lifting more than 20 pounds. They expressly concede that she could do that. I could go through . . . I mean, I could respond specifically to each of these points that the Liberty Plaza and Winston Tower assignments were rare. They were incidental to her job. It was very rare that any of these 14 to 16 SSAs would be assigned to do that. Again, when she . . . And weren't there two other SSAs that weren't required to go to Liberty Plaza and Winston Tower? That is absolutely correct, Your Honor. That were excused from that because of language barriers. So their argument that this was categorical, that everybody had to do everything, is overbroad and inaccurate. Well, what about the testimony . . . And I'm looking at page 507. After a scanning project meant to accommodate her lifting restrictions ended, she was idle for more than 80% of each workday because there were so many tasks that she could not perform. Your Honor, there's a dispute in the record on that. And this, as summary judgment, it should go back for a jury trial. And even the extent to which she could perform those jobs, that occurred prior to her injury, her shoulder injury? What happened . . . Yes, what the defendant did in this case is kind of muddled time periods and injuries. In June 2010, she was out of work for two and a half days. She had a minor injury. As a result of that injury, she could not lift more than 10 pounds. That was for a very short period of time. Then that 10 pound lifting restriction was lifted. And then she was back to the 20 pound restriction. When there was that 10 pound restriction, the commission contests, but assumed to be true for the moment, that they assigned her this light duty. There was no light duty or need for a light duty after the 10 pound lifting restriction was lifted because she has shown from 2008 on that she can perform the job successfully without lifting more than 20 pounds. And she was able to do it. She was very creative. One would look at that and think, how on earth could she do it? But she did. And her supervisors, when she spoke to them about it, they knew about it. And they said, work smarter, not harder. And we don't care how you get the job done, as long as you get a job done. And that's great. They loved her enthusiasm and the fact that she was able to do all of this. And again, one has to focus on the reason in the moment. They did not say when they told her she could not return to work, you can't return to work because we don't know whether you can work at Liberty Plaza. We don't know whether or not you can go to the post office. We don't know whether or not you could work alone. All they said was a mantra. Look at this job description. You have to show that you can lift up to 75 pounds or you can't return to work. She said, well, wait, I can. Look at all the ways that I accommodate myself. This is how I get this job done. You have to lift up to 75 pounds. They were completely unresponsive. They stonewalled her. And they had an obligation to at least engage in an interactive process of reasonable accommodation. No, no, no. I think there are some parts in your brief where it seems to me that you kind of muddle the burdens of proof. For example, you discussed reasonable accommodation in your opening brief. Almost in a manner suggesting that the employer has a burden of proving that no reasonable accommodation existed, which is not entirely correct. She has to show her threshold. Doesn't she have to show that she is capable of performing the essential functions of the job? She has to put them on notice that she has problems lifting. They're the ones that called the meeting and they asked her, update your lifting restrictions. They were very well aware of her lifting restrictions. And then in that meeting- Well, I think there was an issue as to whether it was temporary and she was recovering. And when she got the final doctor's report that put the 20 pounds on permanently, it seemed to me at that point, they have to make an evaluation as to whether she's qualified to do the job. And they concluded that she's not. And your argument is, I guess, that she- But it's speculation, Your Honor. She was successfully performing the job. And they were speculating, and it was supposition, that because with this restriction, even though she had successfully performed the job, all of a sudden she's not. And that kind of, she can't. And that kind of prejudging is exactly why the ADA was enacted, to prohibit. But what about the accommodation, given the fact that the pool of SSAs was dramatically reduced? And I don't remember where in time, and perhaps you do- 2008. I'm sorry. I didn't finish my sentence. I apologize. Where in the relevant time frame that there were other SSAs who were not assigned to Winston and Liberty, that there were fewer SSAs to be able to support one another and to assist each other as needed? Your Honor, that staff reduction occurred in 2008 at the same time as her breast cancer surgery. So it's not terrible. I'm sorry, that really wasn't, that wasn't exactly my point. My point is, in terms of the rotation to Liberty Tower, the Saturday shift, the Liberty Plaza, Winston Tower, the Saturday shift. Yes. And other heavy duty work assignments that could be moved around to other people, but not to her. They were moved around to her as much as anyone else between 2008 and 2011, which was the time that they had to produce staff. And that was not the reason they gave her when they terminated her. Or they told her she couldn't return to work. Okay, but if you could just respond to me directly, regardless of what they said. I'm not answering your question, so can you ask me again, because I want to make sure I. Okay. What I'm trying to do is just put this in the context of the smaller pool of SSAs and her ability to do a variety of functions, including going to Liberty Plaza, including working the Saturday shift, etc. I guess what I'm saying is the relevant period of time and the entire time we're really focusing on in this case is 2008 and 2011. During that period of time, there wasn't a reduction. It was before her breast cancer surgery that it was reduced to 14 to 16 SSAs. Between. We're not, I'm sorry. I know. I know. Thank you, I appreciate it. I'm sorry, it's just that they keep emphasizing this reduction of staff, and it's. That was a part of my question, so we're not, I'm sorry, we're really just. Yeah, it's, it's, yeah, because it's not, it's not relevant, because. Well, it may not be relevant to you, perhaps, but it is to me, and that's. Oh, I apologize, I didn't mean, that didn't sound right. I apologize for that. What I, what I meant was, was that the, the focus of time here is 2008 to 2011 and before, from her breast cancer surgery onward is really the focus. Prior to her breast cancer surgery, they had the staff reduction. And then, from that point on, and in terms of the rotations, she was rotating just like anyone else was rotating. I don't know, according to the record, whether or not that was more or less than prior to 2008. Thank you. Okay, Ms. Starr, thank you. Took me a while. Sorry. Good morning, I'm Jill Strickland, and I'm here on behalf of the appellee, Womble Carlisle. I'd like to start by just clarifying any confusion that might exist about Ms. Jennings' ability to perform her job without having to lift over 20 pounds, and what she, in fact, did. Okay, and, and when, while you're doing that, if you could address this 20 pound, 75 pound differential, because that's a big gap. Yes, Your Honor. I'll start by doing that. Ms. Jennings' lifting restrictions, at best, the most that she could lift when she was given the permanent restriction at the time, in February 2011, at the time she was placed on a medical leave of absence, was 20 pounds. And that is what is relevant to this case. That's what's relevant to determining whether Ms. Jennings was able to perform the essential functions of her job, with or without reasonable accommodations, such that she was a qualified individual with a disability, and even fell within the ADA's protected class. It is true, as Ms. Starr pointed out, that Ms. Jennings testified that at the time she was placed on a medical leave of absence in February 2011, after the law firm had accommodated her and excused her from duties requiring heavy lifting for over six months. She testified that the managers pointed to the 75 pound lifting requirements stated in the job description, that incumbents in the support services job may have to lift up to 75 pounds. What Ms. Starr did not point out, though, is that Ms. Jennings also testified that as her leave of absence went on in July 2011, prior to her termination, the HR personnel began to talk with her in terms of the essential functions of her job. And Ms. Jennings admitted that when she got the letter from the law firm informing her that after her six months leave of absence had concluded, that she understood that the law firm's reasons for her termination was that her leave of absence had expired, her available leave, and she remained unable to do what the law firm considered to be the essential functions of her job. So- And the law firm considered it an essential function of her job because it's, because the job description says may at times have to lift up to 75 pounds? Not, the law firm- Where do we look in the job description to understand that this is an essential function of her job? Particularly when it also says the ability to work independently and flexibly to complete projects, which it seems like she was doing since there were never any negative evaluations of her based on her failure to perform at all. Particularly based on the limiting restrictions. So where can I find that as essential? Starting with your question about the job description, Your Honor. Yes, the job description does state that this is a multiple function job, which courts, including this court, have treated as a little different from most jobs, where people are expected to rotate among various functions as the business needs require. And the job description lists out all of the various functions which do require lifting. And many of that requires lifting over 20 pounds, and states that heavy lifting up to 75 pounds may be required. And that the support services assistants are required to function autonomously and independently. And in response to another part of your question, Judge Thacker, I'd like to clarify what the record evidence shows about what Ms. Jennings did, in fact, do ever since her breast cancer surgery. Ms. Jennings testified that after her breast cancer surgery, but occasionally, job duties that require her to lift more than 20 pounds. And that she was not able to get around those lifting requirements through these modified work arrangements that she's discussed. And- I recall one occasion where she said she wasn't able to get around the lifting requirements, because the scales had been placed in a small room or something. Are there more than one? Is there more than one, and where can I look to in the record for that? Yes, Your Honor. Ms. Jennings testified generally on pages 197 to 199 of the joint appendix. That before her, after her surgery in 2008, but before her injury in June 2010, which resulted from three separate incidents of heavy lifting over 20 pounds within two consecutive work days. On page 199 of the record, the question was, excuse me, it actually begins a little earlier, there's discussion beginning at page 197 about her lifting duties after her surgery. And then on page 198, at line 17, she was asked, so there is at least occasionally a requirement that you do heavy lifting, even after you had your breast cancer surgery, when you worked at Liberty Plaza, and you weren't able to work around it, right? And Ms. Jennings responded, right. And I asked how frequently that occurred, and then she went into an explanation of the occasions on which she had to go in and fill in at Liberty Plaza. And she reiterated that testimony in response to questions from the EEOC attorney, and that's on pages 222 to 230 of the record. I devised my own little ways of getting around lifting. She said that first, in response to my question, she said I devised ways of getting around lifting. And then as I continued to ask her questions in the deposition, she admitted there was at least occasionally a requirement that she do heavy lifting, more than 20 pounds, even after she had the surgery, and she was not able to get around it. I see that. That's where it talks about the scale being in the room. I remember that one. That's the only- Yeah, and Judge Thacker, that was- You were giving me another site, though. The other site was to pages 222 to 230 of the record. And that's where the EEOC attorney asked on cross-examination whether she had testified that after her surgery in 2008, she was still required to engage in having lifting and wasn't able to get around it with her modified work methods. And she testified, yes, I did testify to that earlier. And he said, was that rarely when that occurred? And she said, that was rarely. The majority of the time I was able to get my job done. And I'm paraphrasing because I don't have that actual page directly in front of me. And at the time, this- What was the month schedule that she was on for the six months, let's see, was it after her medical leave expired? You were describing a period of six months when she was given assignments that addressed her physical limitations. Your Honor, if I may, I'd like to clarify the time frame. And I'll start by answering your question. She was, after these injuries in June 2010- The injuries were because of lifting. Yes, three separate incidents in two consecutive days due to lifting. And I'll describe those in a moment because they're important. But after that June 2010 series of incidents resulting in a shoulder injury, Ms. Jennings mentioned in her contemporaneous injury report that she experienced pain and soreness in her shoulder when she had to lift continuously. And that's quoting her, heavy items like she did at work. And she discussed how just the previous week before her injury, she had been at her doctor explaining how she had this pain and soreness in her shoulder after doing heavy lifting, always after doing heavy lifting at work. After that, the company at that point didn't have any record of ongoing lifting restrictions. So they asked Ms. Jennings to go to her doctor and bring information in about any lifting restrictions she might have. And that's when she brought in a renewed ten pound lifting restriction. And the company analyzed, the law firm analyzed which functions she could still do, which functions she could not do. And they allowed her to work from June 2010 until January 2011 for more than six months in an extremely limited capacity. Is that the period when it's described that on page 507, when there was a discussion about the amount of time she was not, she was idle because the functions that had been produced, the scanning, etc., to speak to the lifting issue. Yes, your honor. Had been completed. Yes, your honor. In that time frame between June 2010 and January 2011, Ms. Jennings conceded, and this is not a question of the district judge failing to see the light, the evidence in the light most favorable to the EEOC, Ms. Jennings conceded she was no longer obligated to work alone at Winston Tower or Liberty Plaza. She no longer had done the floor mail runs as she had been trained to do the month previously. She no longer worked the Saturday rotation, which would require her to work alone and to do mail runs to the post office and handle any lifting by herself. Other people actually went throughout the law firm building and retrieved the documents needed for the copying and scanning jobs, brought them to her, and then redelivered them when they were done. So her job duties, as she described them, she spent a third of her time working on an internal low priority scanning project involving the firm's personnel files. That she was instructed to do only when she didn't have anything else to do. In her words, in her spare time. She was also given other light duties that didn't require lifting over, at that time, her ten pound limit. And other low priority duties that could be set aside for her to do that weren't deadline driven, because this is a law firm. Ms. Jennings admitted that she was under deadline pressure on a daily basis before her work duties were curtailed. Ms. Jennings testified that this scanning job, which took a third of her work time, and it ended in either December of 2010 or January 2011, according to the record. And at the time that internal scanning job ended, there was nothing else to fill that full third of her work time that she spent on that low priority task. And that was when the law firm personnel called Ms. Jennings into the office and said, please see if there's an update to your lifting restrictions. And at that point, the law firm, far from not engaging in the interactive process, heard Ms. Jennings talk about the alternate methods, and their response, as shown in the record, is those alternate methods won't permit you to do, they'll help you do some of these duties, but not all of these other duties where they just basically won't work for you. And in fact, that's how she was injured in June 2010. Instead of putting her in a position where she had to choose between either meeting the demands of her position, or exceeding her medical restrictions, they accommodated her again. They put her on a medical leave of absence in the hope that either her condition would improve so that she could do more of the functions of her job. Enough of the functions of the job that would enable a finding that she could do the essential functions of the job. The firm never has taken the position that she had to be able to do 100% of these multiple functions. And as Judge Thacker pointed out during Ms. Starr's argument, there were some occasions where for other reasons, two other employees who had language barriers were excused from performing one function, working the Saturday rotation. But that was just one function, that one Saturday shift that these two employees were excused from. In Ms. Jennings' case, there were multiple functions that she would be required to be excused from, or be placed in the position of injuring herself again and exceeding her job restrictions. I do want to talk a little bit in response to Judge Thacker's question earlier, before my time runs out, about how she injured herself in June 2010. And this is documented not only in Ms. Jennings' testimony on the record, but also in her contemporaneous incident accident report, which she herself prepared in June 2010, immediately after the injury. It's on page 265 of the joint appendix. On one day, working in Liberty Plaza, Ms. Jennings testified that she had to move 14 FedEx boxes, which ranged in weight between 32 and 38 pounds. She said she knew exactly how much they weighed, because she weighed them before sending them out. That same day, she testified that she had to move full cartons of paper that weighed 50 pounds each from one location to another. She was out of work for two days because of her pain and soreness, and then she came back and worked in Winston Tower, where she testified that she again had to move boxes for FedEx delivery ranging in weight from 10 to 30 pounds, and exacerbated her shoulder injury in that manner. And I'm quoting Ms. Jennings here. This is what she wrote in her injury report, and this is what she admitted in her deposition. This is June 2010. As a result of breast cancer, a lymph node was removed from my left arm and causes pain and swelling when I continuously lift objects over 20 pounds. This is immediately after she describes the three incidents at work within two days. And then she says, I had just been to the doctor, my oncologist, the week before, and was asking why my shoulder swells from time to time, always when I am working, where I have to do heavy lifting. I was told that because a lymph node was removed, it will swell and cause pain when I lift more than my limit. That reference to her lifting limit is what caused the firm to come ask her, what are your medical limitations? And to undertake a detailed analysis of what functions she could perform and could not perform. And the fact that this was a multiple function job makes it a little bit different in terms of determining what the essential functions are. And this is a fluid, fast-paced, deadline-driven environment in the law firm. And Ms. Jennings and the other support services personnel were responsible for providing operational support to three different locations within the law firm. In many circuits, the first, the seventh, the eighth, and the ninth, and also the fourth in an unpublished decision of Whitney versus Freightliner referenced in the district court's opinion states that an employer may, for legitimate business reasons, require an employee in a certain job classification to rotate among various functions as needed. And in that instance, an employee will not be deemed to be able to perform the essential functions of the job, with or without reasonable accommodations, and therefore be a qualified individual with a disability, unless the employee can perform enough of those functions to enable a judgment that the employee is qualified for the job, can perform the essential functions. And here, Ms. Jennings, by her own testimony, between 2008 and June 2010, did perform her functions. But unfortunately, in doing that, she had to, at least occasionally by her admission, lift more than her lifting restriction. That's what caused her to be injured. Another thing that's significant about this work environment is it's difficult. There are some tasks where it's very foreseeable that Ms. Jennings or any other support services personnel would have to lift more than her lifting limitation. For example, the Saturday rotation. We know that one person working on a Saturday has to go to the post office and bring full mail buckets back in his or her own vehicle. Ms. Jennings admitted that those weigh more than 20 pounds. The testimony is uncontroverted on that. But then there are other tasks that occur throughout the work day. And Ms. Jennings admitted that she was primarily responsible for working in the copy area, where she did the copying and the scanning work. And as Judge Niemeyer pointed out, that did not mean that she didn't necessarily have to exceed her lifting restrictions in order to retrieve or deliver the documents and get that done. But Ms. Jennings admitted that she also had to, she also was called upon from time to time to do other duties. And those are the duties that, and that's on page 172 of the joint appendix. Those are the duties that from time to time required Ms. Jennings and other support services personnel to lift more than 20 pounds. The evidence from the job, not only the job description, but also the testimony from Womble's managers, and the testimony from Ms. Jennings' co-workers, the other people who held that position, stated that it's not foreseeable or predictable that each support services assistant will have to lift more than 20 pounds on an hour to hour or day to day basis, except for these routine functions like the mail runs, where we know the lifting is going to be more than that. But at any time, these folks can get called upon to perform a function that may or may not involve heavy lifting. It may or may not be deadline driven. In most cases, as Ms. Jennings testified, the tasks were deadline driven until she was placed on light duty. And Womble Carlisle was entitled to heed and honor the medical restrictions that Ms. Jennings' own treating physicians placed upon her. And her testimony that she believed she could still do the job functions, or at least most of them, on her own or pull somebody aside to help her, doesn't carry the weight here. Womble Carlisle was not required to put her back in a job, full duty, that caused her to be injured in June 2010 in light of the medical restrictions to the contrary. And the EEOC did indicate in its brief that it believed a reasonable accommodation might have been just to allow other people to do the lifting functions. Allow somebody else to do the functions that require lifting more than 20 pounds. Unfortunately, that would have required a reallocation of an essential job function and placing a heavier burden, placing all the heavy tasks, all the high priority tasks, or at least the majority of them, on other co-workers, and it would have greatly diminished the flexibility of the support services center. When that providing operational support in this fast-paced, client-driven, deadline-driven environment is the very purpose of Ms. Jennings' job. So we believe that the district court got it right and that Womble Carlisle complied with its obligations fully in trying to work with Ms. Jennings to find a job for her, or create a job for her that would have enabled her to stay within her lifting limitations. And unfortunately, once the limitations became permanent, that was no longer feasible. I see that I'm about out of time. Thank you very much. Star? Your Honors, opposing counsel's argument demonstrate basically that summary judgment was improvidently granted. She points out a lot of disputed issues of fact. For that reason alone, the district court's reversal and remand is required. All of the reasons that were stated about the difficulties that she may have performing the job, she did not have. It's kind of a recasting of what occurred. What occurred was Womble Carlisle, in their judgment, determined that she successfully performed her job. At the time of firing, they didn't bring up all of this. They didn't bring up Liberty Plaza and her ability to do this task or that task. They simply said, show us that you can lift up to 75 pounds and you can come back to work. To say, as opposing counsel just did, that that was some sort of accommodation is quite a stretch. To say that you can't return to work unless you can show you have 75 pounds and here, we'll give you some medical leave. And even though we know that this lifting restriction is permanent, somehow get healed and show that you can lift up to 75 pounds. There's not one SSA who testified that they had to lift that much. And all the SSAs that testified about lifting and moving things all testified that it was a very cooperative atmosphere, that they all kind of helped each other. And that when they had heavy lifting to do, they would ask a fellow SSA to help them, and that that was just common practice. So the idea that this is some sort of extra, to excuse her from some sort of job duty is really not validated by the record in this case. If there are no questions, the commission requests the court to remand the case. Thank you. Thank you. We'll come down and greet counsel and then proceed on to the last case.
judges: Paul V. Niemeyer, Allyson K. Duncan, Stephanie D. Thacker